Filed 9/4/13  P. v. Childress CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOEL CHILDRESS et al.,<br><br>    Defendants and Appellants. | B238241<br><br>(Los Angeles County<br>Super. Ct. No. BA356413) |

APPEALS from judgments of the Superior Court of Los Angeles County.  Ronald S. Coen, Judge.  Affirmed.

Joana McKim, under appointment by the Court of Appeal, for Defendant and Appellant Joel Childress.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant Kelsie J. Palmer.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Eric Allen.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Joel Vincent Childress (Childress), Kelsie James Palmer (Palmer), and Eric Gerare Allen (Allen) (collectively defendants) appeal their convictions of murder, attempted murder, and making a criminal threat. Childress contends that substantial evidence does not support his murder or attempted murder convictions, the finding of premeditation and deliberation, or the gang and multiple-murder special circumstances. Palmer and Allen contend that the trial court erred in refusing to sever the murder charge against Childress in count 1 from the remaining charges. Palmer asserts *Aranda-Bruton* and *Crawford* error[1] in the admission of a recording of Allen's interview with detectives; and all defendants assert several instructional errors and join in the arguments of the other defendant to the extent such arguments might apply to their benefit. Allen contends that his 107 years to life sentence was cruel and unusual under the federal constitution. We reject Allen's constitutional claim but modify his sentence to comply with statutory requirements, and reject defendants' other contentions and affirm the judgments.

## BACKGROUND

### Procedural history

An amended information charged defendants with the following crimes: count 1 charged Childress with the murder of Jose Martinez (Martinez) in violation of Penal Code section 187, subdivision (a);[2] count 2 charged the murder of Rosa Maria Gallegos (Gallegos) in violation of section 187, subdivision (a); count 3 charged the attempted willful, deliberate, and premeditated murder of Kenneth Thomas (Thomas) in violation of sections 187, subdivision (a), and 664; count 4 charged the attempted willful, deliberate, and premeditated murder of Luis Miralda (Miralda); and count 5 charged defendants with making criminal threats against Yvonne Love (Love) in violation of section 422.

---

[1] See generally, *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*); *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

The amended information specially alleged in count 1 that the murder was one of multiple murders committed by Childress within the meaning of section 190.2, subdivision (a)(3). In count 2, the information alleged pursuant to section 190.2, subdivision (a)(22), that defendants committed the murder as active participants in a criminal street gang and in furtherance of the activities of the gang. In counts 1, 2, 3, 4, and 5, the amended information alleged pursuant to section 186.22, subdivision (b)(1)(C), that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members. As to counts 1, 2, 3, and 4, it was alleged that a principal personally and intentionally used and discharged a firearm, within the meaning of section 12022.53, subdivisions (c) and (e)(1). As to count 1, it was alleged that the discharge of the firearm proximately caused great bodily injury and death to Martinez. As to count 2, it was alleged that the discharge of the firearm proximately caused great bodily injury and death to Gallegos.

Defendants were tried together before a single jury, which convicted them of counts 2, 3, 4, and 5 as charged, found the murders to be in the first degree, and found the attempted murders to have been committed willfully, deliberately, and with premeditation. Childress was convicted of murder in the second degree in count 1. The jury found true all special allegations and the special circumstances.

On January 3, 2012, the trial court sentenced Childress and Palmer each to the middle term of two years in prison as to count 5 as the base term, plus a consecutive five-year enhancement due to the gang finding. The court sentenced Childress to a consecutive term of 15 years to life as to count 1, plus a firearm enhancement of 25 years to life. As to the remaining counts, the trial court imposed upon both Childress and Palmer consecutive prison terms and enhancements as follows: life without the possibility of parole (LWOP) as to count 2, plus a firearm enhancement of 25 years to life; a life term on each of counts 3 and 4, plus a consecutive firearm enhancement of 25 years to life. Additional firearm enhancements and gang enhancements were imposed and stayed. Childress and Palmer were ordered to provide tissue samples and to pay

mandatory fines, fees, and victim restitution. Childress was awarded 971 days of actual custody credit. Palmer was awarded 965 days of actual custody credit.

On January 20, 2012, the trial court sentenced Allen (whose age was 15 years 11 months at the time of the crimes) to the middle term of two years in prison as to count 5, plus a consecutive five-year enhancement due to the gang finding. As to count 2, the court sentenced Allen to 25 years to life instead of LWOP due to his youth, plus a consecutive firearm enhancement of 25 years to life. The court imposed sentences on counts 3 and 4 identical to those imposed on Childress and Palmer: life in prison plus a consecutive a firearm enhancement of 25 years to life as to each count. Additional firearm enhancements and gang enhancements were imposed and stayed. Allen was ordered to provide tissue samples and to pay mandatory fines, fees, and victim restitution. He was awarded 882 days of actual custody credit.

Defendants filed timely notices of appeal from the judgments.

**Prosecution evidence**

*Gang evidence*

All parties stipulated that the Black P-Stone Gang (P-Stone or P-Stones) was a criminal street gang within the meaning of section 186.22 and to the admission of certified court records of the 2009 conviction of P-Stones member Justin Birdsong for felony possession of cocaine base for sale, and the 2011 robbery conviction of P-Stones member Kevin Lamar Sanford.

Officer Brian Thayer of the Los Angeles Police Department (LAPD) Southwest Gang Impact Team, arrested Palmer in May 2009. Officer Thayer testified he recognized Palmer from about 25 prior contacts. Palmer had been served with a P-Stones gang injunction and admitted to Officer Thayer he was a member of the P-Stones. Since 2004, Officer Thayer also had many contacts with Allen who had also been served with a gang injunction. Allen admitted being a member of the P-Stones, and other gang members have identified Allen as an active member of the gang. LAPD Officer Geraldine Vasquez testified she had stopped Allen and Palmer together in August 2007 at which time they both admitted they were members of the P-Stones.

4

LAPD Officer Kenneth Sanchez testified as the prosecution's expert on gangs. He testified that the primary activities of the P-Stones were vandalism, robbery, carjacking, burglary, bank robbery, murder, attempted murder, home invasion, and extortion and that he had arrested or investigated P-Stones members for such crimes. The P-Stones was a Blood gang with mostly African-American members and several subsets, including the Jungle clique and the Bity Stones, also known as City Stones. Its territory bordered or sometimes conflicted with that of rival gangs, including several Crip gangs and the 18th Street Gang (18th Street). 18th Street was primarily a Hispanic gang, although it had some African-American members. Alsace, a clique within 18th Street, the Schoolyard Crips, and the Rollin' 60's, were also rivals of P-Stones.

P-Stone members often wore red, preferring red St. Louis Cardinals hats with the letters S, T, and L which signified "Stone Love" to them. P-Stone members often wore tattoos with a St. Louis Cardinals emblem, as well as BPS, CS (for subset City Stones), BS (for either subset Bity Stones or for Black Stones), or a five-pointed star (signifying love, peace, truth, justice, and freedom). The tattoos often included crossed-out letters associated with rival gangs; thus a crossed-out E or 8 would signify its rivalry with 18th Street.

Officer Sanchez testified that respect was very important in gang culture, explaining that each gang had a hierarchy, with levels of status comparable to ranks in a command structure. Gang members earned respect and thus elevated status by "putting in work" for the gang, which meant committing crimes that brought in revenue or spread fear in the community. Because respect and fear were so important to the gang's ability to control its territory, the crime of murder garnered the greatest respect. Other ways to earn respect included intentionally disrespecting rivals by crossing out graffiti in their territory, replacing it with P-Stones graffiti, or writing graffiti that was otherwise disrespectful of rivals.

The territory of the P-Stones Jungle set included lower Baldwin Village. The territory of the Bity Stones set was primarily the West Adams corridor, including the area of Adams and Crenshaw Boulevards, which was close to 18th Street territory. Members

5

of 18th Street mostly congregated in the West Adams corridor near 11th Avenue and Jefferson Boulevard. Both 18th Street and West Boulevard Crips claimed the intersection of Adams and Rimpau Boulevards. Officer Sanchez testified that wearing a blue bandanna in Crips territory might signify to a P-Stones member that the person was a Crip gang member, while wearing a Los Angeles Dodgers hat in 18th Street territory might signify to a P-Stones member that the person was an 18th Street gang member. In such circumstances, or where any young Latino man is simply talking to a young Latino woman in 18th Street territory, younger P-Stones members would feel obligated to confront or take some action that would make themselves known and show dominance. Officer Sanchez explained that gang members usually did not enter rival gang territory without expecting a confrontation in the form of a fight or a shoot-out.

### Martinez murder (count 1)

Detective James Yoshida of the LAPD Criminal Gang Homicide Division testified he was assigned to investigate the shooting death of Martinez on February 5, 2008, near Adams and Rimpau Boulevards. Martinez had suffered two bullet wounds to the head, one fatal. As part of his investigation, Detective Yoshida interviewed Donoven Gray (Gray) in May 2008.[3] Gray had been arrested two weeks after the shooting when he attempted to dispose of the revolver which was later determined to have been used in the shooting.

Detective Yoshida also obtained surveillance videos of the crime scene from a liquor store and motel. Portions of the video recordings were played for the jury. Since the picture quality was poor, Detective Yoshida described the images for the jury. He explained the white four-door sedan seen circling around and slowing to a stop at the curb in front of the liquor store where the victim was standing, before making a three-

---

[3]     Detective Yoshida observed "SL" tattooed on Gray and understood it to stand for Stone Love. Gray was brought before the jury so that Detective Yoshida could identify him, and for the jury to observe his tattoos: a "B" on his right cheek; "P-Stone" on his forehead; and an "S" and a picture of a hand with the thumb down on his left cheek. Gray was called as a prosecution witness but invoked his Fifth Amendment privilege not to testify. Despite being given use immunity, Gray continued to refuse to testify.

6

point turn and coming to a stop. Two flashes were then seen in front of the liquor store, after which a person ran toward the white car, which then travelled eastbound on Adams Boulevard behind a bus and stopped at a stop sign on the southeast corner of Adams and Rimpau Boulevards.

Detective Yoshida also identified several still photographs taken from the video recordings, showing a person in dark clothing getting out of the white car in front of the liquor store and of the car making a turn at Adams and Rimpau Boulevards. With enhancement of the photographs, Detective Yoshida determined that the white car was a Chevrolet Malibu sedan from 1999 or 2000. He saw such a car a few days later several blocks from the crime scene and noted the license plate number: 4DRD657. Later, when he again searched for the car, he found a similar Malibu, black in color, with no license plate, parked almost directly in front of the address where he had seen the white Malibu.

In May 2009, Detective Yoshida and others interviewed Childress who was in custody on other charges. Childress said the black Malibu and the white Malibu were the same car, and he identified photographs of Gray and Kinano Massengale (Massengale), whose monikers were "Devil" and "G-9." The Malibu belonged to Childress's mother, who had painted the car after an accident. After Detective Yoshida described the Martinez shooting and told Childress that his car had been seen in video footage of the incident, Childress then related the events of the evening: he met up with Gray, Massengale, and another man, "Ace Capone"; Massengale wanted to "put in work" because he felt he did not do enough; when Gray saw the victim in front of the liquor store, he told Childress to go back and said something about "my evil face"; Childress returned and parked; Massengale got out of the car, fired some shots, and ran back to the car.

Childress told the detectives he usually lived with his mother, but stayed occasionally at the address where the Malibu was found. He admitted being a member of the P-Stones since high school, and that members of the gang understand that getting out of a car to "bang" on someone meant that violence would result. Initially Childress denied knowing that Massengale had a gun that evening, but later admitted that after he

7

picked up the others, he guessed they stopped at Gray's grandmother's house to pick up a gun. Childress agreed that ordinarily when a gang member got out of a car to bang on someone, he would not be armed with a knife or pipe; but he added that Massengale did not get out of the car, as the "dude was already in the street. He just opened his door . . . and just started shooting at him" with a revolver. Childress suggested he had no choice but to do as he was told by the others because they would probably "hunt [him] down" otherwise.

Detective Yoshida testified that although Martinez was not a gang member, the area of the shooting was in 18th Street territory and the black LA Dodgers cap worn by Martinez was ordinarily associated with the Alsace faction of 18th Street. Detective Yoshida explained it was common in gang related shootings for there to be several occupants in the car, so that the shooter and others involved would have an eyewitness to provide the proof necessary to gain the gang's respect for committing the crime. It was also important to have a getaway driver to facilitate a fast escape from "behind enemy lines" -- in this case, 18th Street gang territory.

### *May 8 shooting and threats (counts 2-5)*

Sometime after 10:00 a.m. on May 8, 2009, Love was walking along Exposition Boulevard wearing a blue bandanna on her head. A black Chevrolet Malibu stopped next to her at a stop sign, and the front passenger, whom she later identified as Palmer said, "You shouldn't be wearing that rag, bitch," and asked where she was from. Love had heard of the Crip and Blood gangs and knew that Crips wore blue while Bloods wore red. Palmer was wearing a red and gray sweatshirt; and she understood him to be referring to her blue bandanna and asking her what gang she belonged to. When Love replied she was a grown woman and did not bang, Allen got out of the back seat of the Malibu and held a revolver against her side. Meanwhile, Palmer was "running his mouth" while holding a gun in his lap, saying such things as, "Bitch, you don't know who you fucking with."

Initially Love was not afraid, but became frightened when Palmer continued "pumping [Allen] up" while Allen's hand was on the trigger. Then Allen said, "Bitch,

8

you can get smoked," which she interpreted as a threat to shoot and kill her. During the encounter, the driver who Love later identified as Childress, got out of the car and said, "Bullets ain't got no name on it," which Love understood to mean that anyone could be shot. Finally Love said, "If you going to do something, you going to do something, I'm tired of standing here waiting. If you going to do it, you going to do it." Defendants then drove away. Love took down their license plate number and called 911.

Meanwhile, 19-year-old Gallegos was sitting in the driver's seat of her parked car outside her boyfriend, 19-year-old Miralda's home on 11th Avenue near Jefferson Boulevard, a neighborhood where 18th Street gang members lived or congregated. Thomas, Miralda's 32-year-old African-American neighbor was standing next to Miralda while he spoke with Gallegos. A black Malibu pulled up and stopped alongside Gallegos's car.

Miralda was frightened when he saw two African-American men in the front seat of the Malibu because he had heard that P-Stone gang members targeted Latinos. A few seconds after the Malibu stopped, Miralda saw the rear passenger emerge and fire a weapon. Thomas thought there had been two men in the back seat and that both fired guns. Thomas also saw the front passenger point a gun at him from the car. Thomas was struck in the arm by a bullet, shattering the bone and leaving him without gripping strength. Gallegos was struck four times and died from her wounds. As soon as the shooting stopped, the Malibu left in the direction of Jefferson Boulevard.

Later the same day, detectives transported Miralda to a gas station where a black Malibu and its driver had been detained. Miralda identified the black Malibu as the one involved in the shooting and Childress as the driver. Miralda later identified the front passenger as Palmer and the shooter as Allen.

*Allen Interview*

During their investigation of the Gallegos murder, Detectives Brian Calicchia and Richard Gordon interviewed Allen in December 2009. Portions of the recorded interview were played for the jury after the trial court admonished: "[T]he contents of this are

9

admissible and I believe admitted against defendant Allen only and not to any other defendant."

At first Allen denied he was a member of the P-Stones but later admitted that he had been "running with" the gang for a year. He also denied at first that he had ever been in a white or black Chevrolet Malibu, and claimed that he was in school on May 8, 2009. Allen then admitted he was in the back seat of the car, riding around and smoking, and that while they were on their way to buy tobacco, they saw the woman in the blue bandanna. After "talking shit" to the woman, Allen and his companion drove off laughing. Allen claimed to not remember getting out of the car or what he said.

After the incident with Love, they saw three people. Allen told the detectives: "When they drove by they like banged off -- I guess banged on somebody. And (inaudible) you know pointing something at them. Then ask him and then they did what they did. Like that." Allen claimed that one of three, a man wearing a T-shirt, extended his arm, pointed something, started shooting, and then ran away. Allen denied he had been armed and claimed that he did not know "that they was going to do nothing like that" or that they had killed someone. One of his companions tossed a gun to another companion, but Allen claimed not to have seen whether it was a semiautomatic or a revolver -- "It was like brown or something."

### Gang expert's opinions

Officer Sanchez was recalled to give his expert opinions based upon his gang expertise, his review of LAPD resources, his personal contacts with gang members, and the nature of the tattoos observed on defendants and their associates. In Officer Sanchez's opinion, Gray, Massengale, Childress, Palmer, and Allen were all members of the P-Stones. In May 2009, Childress, Palmer, and Allen were active participants in the gang.

Officer Sanchez explained the significance of defendants' various tattoos which demonstrated association with the P-Stone gang or its cliques and disrespect for rival gangs. Allen's tattoos included "NRK" meaning the "No Respect Crew," a clique of the P-Stone gang and a tattoo of a crossed-out common Crip sign. The K in lieu of a C and

10

the crossing out were meant to demonstrate hatred for Crip gangs. In a photograph of Childress taken after his arrest, "Bitys" appears on his chest, with an X over the Y. "City Stones" and "1∘5∘8" appear on his abdomen, with an X over the over the C, Y, O, E, and 8. Officer Sanchez explained that the X's represented disrespect for rival gangs. In particular the E and 8 are crossed out to show disrespect for 18th Street gang. Additionally, Officer Sanchez explained the icons on the cell phone taken from Childress after his arrest, "fugk tha fakez" over "FFK.JPG," symbolized the P-Stone's hatred for 18th Street.

In response to three hypothetical questions that tracked the facts in evidence regarding the Martinez shooting, the threats made to Love, and the Gallegos shooting, Officer Sanchez opined the crimes were committed in association with the P-Stone gang in order to benefit the gang.

**Defense evidence**

Allen called Detective Calicchia to explain law enforcement's documentation of investigatory stops and arrests of gang members. Palmer called Detective Gordon, who had interviewed Thomas on May 11, 2009, as well as Detective Calicchia, who had interviewed Love on May 8, 2009, in order to show that some of the witnesses' trial testimony conflicted with some of the information provided in their interviews. A recording of the Love interview was played for the jury.

Palmer presented the testimony of Dr. Robert Shomer, an experimental psychologist who specialized in eyewitness identification, who explained unreliability of eyewitness identification, including how such factors as stress and the use of weapons negatively affect a witness's recall and accuracy, and how earlier identifications could affect later ones.

Childress did not testify or present other evidence in his defense.

## DISCUSSION

### I.  Childress:  sufficient evidence

Childress contends that his convictions of murder and attempted murder and the special circumstance findings must be reversed because:  (a) there was insufficient

11

evidence to support a finding that he or his companions harbored an intent to kill the victims or that he facilitated the crimes; (b) the evidence was insufficient to find that he premeditated and deliberated the murder of Gallegos; and (c) the special circumstance findings were unsupported by substantial evidence of intent to kill. His contentions lack merit.

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid*.) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### A. Intent to kill

Childress contends that the evidence was insufficient to support his conviction of murder and attempted murder as an aider and abettor because substantial evidence did not support a finding that he shared the actual perpetrators' intent to kill. We find substantial evidence established that the shooters in both incidents harbored an intent to kill the victims and that Childress shared that intent when he facilitated the crimes.

"All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful

12

purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

"[W]hen the charged offense and the intended offense . . . are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, . . . the aider and abettor must know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; see also *People v. Smith* (2005) 37 Cal.4th 733, 739.)

Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.) Massengale's act of firing toward Martinez at a close enough range to inflict two bullet wounds, one of them fatal, was sufficient to support an inference of intent to kill. (See *ibid*.) And when Allen, Childress's fellow gang member, fired multiple shots at close range at a group of three people in rival gang territory, the jury could also reasonably infer a specific intent to kill. (See *People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002 (*Rand*); *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192.)

In addition, ample evidence supports a finding that Childress knew of the shooters' intent and knowingly facilitated both murders and the attempted murders with the requisite shared mental state. Facts relevant to determining whether substantial evidence supports such a finding include companionship and conduct before or after the offense. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.) While mere presence at the crime scene is insufficient, it is a factor to consider. (*Ibid*.)[4] In addition, serving as a lookout or driving the getaway car may give rise to a reasonable inference that the

---

[4]     Childress discusses at length a case in which the federal court found that the evidence showed only that the defendant had been merely present at the scene of a murder. (See *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262.) The facts of that case are too dissimilar to provide a helpful analogy.

defendant intended to facilitate the crime. (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743.)

Childress, an admitted gang member, drove two fellow gang members into rival gang territory, knowing that they wanted to "put in work for the gang," or create fear in the community or show disrespect for rival gang members by committing violent crimes. Martinez, who was wearing a black Los Angeles Dodgers hat in 18th Street territory, gave the appearance of a rival gang member. This prompted P-Stone members to confront him, an act that by Childress's own admission would result in violence. Childress "guess[ed]" that Gray had a gun. When Gray saw Martinez in front of the liquor store, Gray pointed Martinez out to Massengale and told Childress to drive back. The surveillance video shows that Childress drove back around, stopped, waited for Massengale to fire several times and then run back to the car, before Childress drove away. Officer Sanchez testified that in drive-by shootings by gang members, drivers played an important role by getting in and out of the location quickly in order to avoid police or witness identification.

We find no merit to Childress's argument that any intent to facilitate a murder was negated by his statements to the police that he merely guessed there was a gun in the car and that he feared the consequences of not doing as he was told. "[C]onfessions stand upon the same footing as other evidence and are to be weighed by the jury in the same manner. All parts are not necessarily entitled to the same credit, and the jury may believe a part and reject the remainder of a confession. [Citations.]" (*People v. Garcia* (1935) 2 Cal.2d 673, 679.) Thus the jury was free to reject Childress's self-serving statements and credit those that inculpated him. We decline to second-guess the jury, as the reviewing court neither reweighs the evidence nor resolves conflicts. (See *People v. Young*, *supra*, 34 Cal.4th at p. 1181.)

The jury could also reasonably find that Childress knew and shared Allen's intent to kill Gallegos, Miralda, and Thomas. Once again Childress drove fellow P-Stone members to 18th Street territory. On the way, Childress stopped so that he and his companions could threaten a woman wearing a blue bandanna. Childress certainly knew

14

there were guns in the car on that day, as Palmer held one in his lap; Allen pointed his gun at Love while threatening her; and Childress added the threat, "Bullets ain't got no name on it." Childress then drove to an area where P-Stone members were known to target young Latino people, stopping his car alongside a young Latino couple in conversation. As Officer Sanchez testified, gang members usually expected a fight or a shoot-out when they entered rival gang territory, and Childress's expectation of a shooting was demonstrated by his role in the Martinez murder. As in that previous shooting, it was mere seconds after Childress stopped the car that the shooter emerged firing his weapon at the victims while Childress waited in the car.

In sum, substantial evidence established that Childress knowingly drove armed fellow gang members to rival territory for the purpose of violently confronting others; that he stopped his car close to the victims; that he waited while his fellow gang members fired multiple shots at the victims; and that he then drove his confederates away from the scene. Thus substantial evidence supported a finding that Childress shared Massengale's and Allen's intent to kill and acted with the purpose of facilitating the commission of the crimes.

### B. *Premeditation and deliberation*

Childress contends that the evidence of premeditation and deliberation was insufficient to support his conviction of the first degree murder of Gallegos. This contention is also without merit.

Premeditation and deliberation means "preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) "'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"' [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.)

Childress cites *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), in which the California Supreme Court suggested "three types of evidence -- evidence of planning activity, preexisting motive, and manner of killing -- that assist in reviewing the

15

sufficiency of the evidence supporting findings of premeditation and deliberation. [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) Childress does not discuss motive or manner of killing, but merely contends that without evidence of a discussion among the three gang members, driving the car was not enough by itself to suggest planning. There is no requirement that all three factors be established or that any factor must be shown by direct evidence. (*People v. Perez, supra*, at pp. 1124-1125.) It follows that there is no requirement that planning be established by evidence such as the aider and abettor's discussion of his state of mind.

Planning may be reasonably inferred from evidence that the defendants armed themselves before the shooting. (See, e.g., *People v. Caro* (1988) 46 Cal.3d 1035, 1050.) Motive in gang shootings is reasonably inferred from the hatred felt for rival gang members. (*People v. Sanchez, supra*, 26 Cal.4th at p. 849; *Rand, supra*, 37 Cal.App.4th at pp. 1001-1002.) A very similar prior crime may also provide evidence of motive. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017-1018.) Premeditation and deliberation may be reasonably inferred when a gang member fires multiple shots at a group of people in rival territory. (*People v. Francisco, supra*, 22 Cal.App.4th at p. 1192.)

All such evidence was presented here. Like other P-Stone members, Childress hated 18th Street members, as demonstrated by his tattoos, telephone icons, and his participation in the murder in 18th Street territory of Martinez wearing a hat associated with that gang. We have already found substantial evidence demonstrating that Childress drove into rival gang territory knowing his fellow gang members were armed, stopped near a group that included young Latinos, and waited while Allen shot at them with the intent to kill them. Moreover, we have already found that substantial evidence supported a finding that Childress shared Allen's intent to kill. "It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation . . . . [Citation.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1166.)

16

We conclude not only that substantial evidence supports a finding that Childress aided and abetted the murder of Gallegos, shared Allen's intent to kill, and did so with premeditation and deliberation, but also that such evidence was overwhelming.

## C. *Special circumstances*

Childress contends that the special circumstances of gang participation and multiple murder must be reversed because substantial evidence did not support a finding that he harbored an intent to kill.

As relevant here, a penalty of LWOP is imposed for murder in the first degree if the jury finds that "the defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree." (§ 190.2, subd. (a)(3).) LWOP is also imposed upon a "defendant [who] intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22).) A defendant who aided and abetted such murders is also subject to a penalty of LWOP if he or she acted with the intent to kill. (§ 190.2, subd. (c).) To convict a defendant who was an aider and abettor with the special circumstance of multiple murders or gang participation, the jury was required to find that defendant acted with the intent to kill. (*People v. Jones* (2003) 30 Cal.4th 1084, 1117-1118 (*Jones*).)

We have already found substantial evidence that Childress intentionally facilitated the murders with full knowledge of his cohorts' intent to kill and that he premeditated and deliberated the killing of Gallegos. In addition to the arguments we rejected in coming to that conclusion, Childress suggests that the jury should have construed his guess that his cohorts had a gun as a claim that he was unaware they had a gun, and that the jury was required to believe his statement to detectives that he thought Massengale merely intended to rob Martinez.

It is the province of the jury to believe or disbelieve testimony, resolve conflicts in the testimony, and draw factual inferences. (*People v. Alexander* (2010) 49 Cal.4th 846, 883.) Further, the fact that the evidence can be reconciled with a contrary finding does not require reversal. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

17

Moreover, we do not agree that the inferences Childress would have this court draw are reasonable. To guess that something is true is not a denial; thus, Childress's guess that his fellow gang member was armed cannot be reasonably construed as a claim of ignorance. Further, although defense counsel *argued* that Childress merely intended to rob Martinez, that is not what Childress said. Childress told Detective Yoshida the reason he felt he could not refuse to do as the other gang members demanded. Detective Yoshida suggested, "Yeah, otherwise, they're going to say, that guy --"; Childress interrupted with: "He just rob him or he's --"; Detective Yoshida then completed his sentence with "That guy bailed on us." The more reasonable interpretation of Childress's statement was that he drove the others, knowing they intended to shoot someone, because he did not want the gang to think he merely meant to rob the victim.

In any event, the jury was not required to believe Childress's statement, or give it any weight. (See *People v. Garcia*, *supra*, 2 Cal.2d at p. 679.) We again decline to reweigh the evidence or resolve evidentiary conflicts. (See *People v. Young*, *supra*, 34 Cal.4th at p. 1181.)

## II. Claimed instructional errors

### A. *Childress: aider and abettor instruction*

Childress contends the trial court erred in failing to instruct the jury that the intent of an aider and abettor must be formed before or during the commission of the offense. He further contends that the omission resulted in a denial of due process. Both contentions lack merit.

The trial court instructed the jury regarding aiding and abetting with CALJIC No. 3.01 as follows: "A person aids and abets the commission or attempted commission of a crime when he or she, one, with knowledge of the unlawful purpose of the perpetrator; and two, with the intent or purpose of committing or encouraging or facilitating the commission of the crime; and three, by act or advice aids, promotes, encourages or instigates the commission of the crime. A person who aids and abets the commission or attempted commission of the crime need not be present at the scene of the crime. Mere presence at the scene of a crime which does not itself assist the commission of the crime,

18

does not amount to aiding and abetting. Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

For aiding and abetting liability to attach, the intent to aid and abet must be formed prior to or during the commission of the offense. (See *People v. Cooper* (1991) 53 Cal.3d 1158, 1164-1165 (*Cooper*).) Childress contends that the trial court should have clarified this rule, such as by using CALCRIM No. 401.[5]

As respondent points out, Childress's failure to object to CALJIC No. 3.01 resulted in a forfeiture of this claim of error. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) Childress relies on *Cooper* to suggest that the California Supreme Court disapproved of CALJIC No. 3.01 due to the failure of the instruction to clearly state that intent must be formed prior to or during commission of the offense. To the extent that Childress contends that CALJIC No. 3.01 is an incorrect statement of the law, his failure to object did not result in forfeiture. (See *People v. Hudson*, *supra*, at p. 1012.)

However, the California Supreme Court did not disapprove of CALJIC No. 3.01. It held that in a *robbery* case, the jury must be informed that the intent to aid and abet must exist before the robbers reached a place of safety with the stolen property. (*Cooper*, *supra*, 53 Cal.3d at pp. 1162-1163, 1167-1170.) As guilt in this case was not premised on robbery, *Cooper* has no application here. Childress's reliance on *People v. Pulido* (1997) 15 Cal.4th 713, is equally misplaced as he was not charged with felony murder. In that case, the California Supreme Court held that the *Cooper* instruction should not be given in felony murder cases; rather, the jury should be instructed that a nonkiller must have been an aider and abettor or a coconspirator at the time of the killing. (*Id.* at pp. 723, 726.)

---

[5]     CALCRIM No. 401 reads: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

Where, as here, the defendant has been charged with aiding and abetting a crime committed with malice aforethought, and the jury has been instructed regarding premeditation and deliberation, CALJIC No. 3.01 need not be clarified with a statement that the intent to aid and abet must be formed before or during the actual offense rather than afterward. (*People v. Williams* (199) 16 Cal.4th 635, 675.) Further, the instruction adequately tracks the elements of aiding and abetting set forth in *People v. Beeman*, *supra*, 35 Cal.3d at page 561; such elements *presuppose* that an aider and abettor has formed the requisite intent prior to or during the commission of the crime, because "[i]t is legally and logically impossible to both form the requisite intent and in fact aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended." (*Cooper*, *supra*, 53 Cal.3d at p. 1164.) As respondent notes, "Obviously, a person cannot encourage, facilitate or commit a crime that has already been committed." CALJIC No. 3.01 thus sufficiently instructs the jury that it must find that the defendant's own intent and the aiding and abetting coincided with his knowledge of the perpetrator's intent to commit or attempt to commit the crime.

Thus, to the extent Childress assigns error to the trial court's failure to provide a clarification of CALJIC No. 3.01, we agree with respondent that he has forfeited the issue. (See *People v. Hudson*, *supra*, 38 Cal.4th at pp. 1011-1012.) Childress asks that we nevertheless reach the issue as permitted by section 1259 because the error affected his substantial rights. (See *People v. Smithey* (1999) 20 Cal.4th 936, 976.) Whether substantial rights have been affected is determined under the prejudice test of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Felix* (2008) 160 Cal.App.4th 849, 857.) Thus, it must appear reasonably probable the defendant would have obtained a more favorable result in the absence of error. (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Childress contends that this test is satisfied because there was no substantial evidence that he shared an intent to kill or even knew that his companions intended to shoot someone. However, we have already rejected those contentions, finding substantial evidence of Childress's intent to kill the victims as well as his premeditation and deliberation in the May 8 shooting.

20

Childress also contends that the fact of the jury's request for a readback of Miralda's identification testimony was sufficient, by itself, to suggest prejudice.[6] He fails to explain however, how the timing of the formation of his intent to aid and abet a murder could affect his identification as the driver, and we discern no connection between the two concepts. Nor do we discern any reasonable probability that a clarification of the timing of his intent would have affected the verdicts, as Childress did not request an instruction regarding liability as an accessory and presented no substantial evidence that he formed his intent to facilitate the murders only after the shooting stopped.

Thus Childress's substantial rights were not adversely affected by the trial court's reading of CALJIC No. 3.01, and Childress forfeited any claim of error based upon the absence of language with more precise timing. The language was sufficiently clear to convey to the jury the concept that intent to aid and abet must exist at the time of the commission of the crime.

### B. Childress: special circumstances instruction

Childress next contends that the trial court erred in failing to instruct the jury that in order to find the special circumstances of an aider and abettor true, it must find that he intended to kill.

An element of the multiple-murder special circumstance is an intent to kill in at least one of the multiple murders. (*People v. Rogers* (2006) 39 Cal.4th 826, 892.) The trial court was required to instruct the jury that to find the special circumstances true as to Childress as an aider and abettor, it must find that he intended to kill. (*Jones*, *supra*, 30 Cal.4th at p. 1119; see also *People v. Williams* (1997) 16 Cal.4th 635, 689.) The

---

[6]     The only authority cited for Childress's readback contention is *People v. Markus* (1978) 82 Cal.App.3d 477 (*Markus*), which has no relevance to the facts or circumstances of this case. In *Markus*, the trial court answered in the negative to the jury's question whether the defendant could be convicted of burglary as an aider and abettor if he formed the intent to aid and abet after the entry by the actual perpetrator; the appellate court held that the trial court erred, and that such a defendant would be an accessory. (See *id*., at pp. 480-482.) Later, the California Supreme Court disapproved the *Markus* rule. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1042-1045.)

21

prejudicial effect of a failure to so instruct the jury is measured under the test of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*Jones*, *supra*, at p. 1119.) "Under that test, an error is harmless only when, beyond a reasonable doubt, it did not contribute to the verdict.' [Citation.]" (*Ibid*.; see also *Neder v. United States* (1999) 527 U.S. 1, 18.)

We agree with respondent that the error here was harmless beyond a reasonable doubt. First, the trial court sequentially explained the two special circumstances alleged against Childress; immediately after instructing with regard to the multiple-murder special circumstance, the court instructed the jury that in order to find the gang special circumstance, it must find that the defendant intentionally killed the victim while actively participating in a criminal street gang. Second, as we have previously concluded after a review of the whole record, overwhelming evidence supported a finding that Childress aided and abetted the murder of Gallegos, shared Allen's intent to kill, and did so with premeditation and deliberation. We conclude beyond a reasonable doubt that the error did not contribute to the verdict. (See *Neder v. United States, supra*, 527 U.S. at pp. 15-16; *Chapman, supra*, 386 U.S. at p. 24.)

### C. Unanimity instruction

Defendants all contend that the evidence showed that more than one of their statements to Love could have formed the basis of the charge of criminal threats, and that the prosecution did not clearly elect to proceed on one of them. Defendants thus conclude the trial court erroneously failed to give a unanimity instruction in the form of CALJIC No. 17.01 or its equivalent, which instructs the jury to agree unanimously on the act or acts constituting the offense.[7]

---

[7] CALJIC No. 17.01 instructs: "The defendant is accused of having committed the crime of [in Count ]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on Count ] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of the [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count ], all jurors must agree that [he]

A criminal threat is a statement, willfully made with the specific intent that it be taken as a threat to commit a crime which "will result in death or great bodily injury to another person . . . even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . ." (§ 422.)

A criminal defendant is entitled to a unanimous jury verdict as a matter of due process under the state and federal Constitutions. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.]" (*Ibid.*) A unanimity instruction is typically given where several acts could have been charged as separate offenses. (*People v. Maury* (2003) 30 Cal.4th 342, 422.) Ordinarily, when more than one act could qualify as a criminal threat, the prosecution must elect one of them or the court must give the unanimity instruction, and the court must do so sua sponte in the appropriate case. (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882.)

Here the prosecutor did not elect just one threat, but two.[8] Although Love testified that defendants made several threats, she expressly identified only one threat that placed her in fear: she became frightened when Allen displayed his gun and said, "Bitch, you can get smoked." She understood him to mean that she could be shot and killed. In closing argument, the prosecutor identified that threat as well as Childress's statement "Bullets ain't got no name on it," which Love understood to mean that anyone could be shot. The prosecutor argued that Love's sustained fear was demonstrated by making a 911 call afterward and by the sound of her voice as she made the call.

[she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."

[8]     The prosecutor also argued that Palmer made threats, but did not identify a particular threat and argued that he was guilty as an aider and abettor by "pumping [Childress and Allen] up."

Defendants did not request a unanimity instruction and it is doubtful that such an instruction was required here. No unanimity instruction is necessary if the defendant offers the same defense or defenses to the various acts constituting the charged crimes. (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) Defendants did not offer a separate defense with regard to each of the two threats identified by the prosecutor. Childress argued that neither statement could reasonably be understood as a threat and that Love was not placed in sustained fear by anything he or his companions said to her during the encounter. Palmer and Allen both argued that Love was mistaken or lied in her identification of them as occupants of the car.[9]

To the extent that a unanimity instruction may have been required, the same circumstances demonstrate that its omission was harmless under either the standard of *Chapman* or *Watson*. (See *People v. Wolfe* (2003) 114 Cal.App.4th 177, 185-186 [split of authority as to which harmless error standard applies to unanimity instructional error].) The omission of a unanimity instruction is harmless "if the record indicated the jury resolved the basic credibility dispute against the defendant and would have convicted the defendant of *any* of the various offenses shown by the evidence to have been committed. [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, 307.) It is apparent here that the jury believed Love and disbelieved defendants, as demonstrated by its rejection of Palmer and Allen's identification defense and Childress's claim that Love simply did not experience sustained fear. Having resolved such basic credibility issues against defendants, the jury would not have found them guilty of making one criminal threat but not the other.

Moreover, a jury is not required to decide unanimously which defendant is guilty as an aider and abettor and which defendant is guilty as a direct perpetrator. (*People v. Majors* (1998) 18 Cal.4th 385, 407.) Thus, even if some jurors believed that only Allen's threat satisfied the elements of section 422 and others believed that only Childress's threat satisfied the elements, a unanimity instruction or lack of it could not have affected

---

**9** Some of Love's testimony was confusing or conflicting and her behavior throughout cross-examination was odd.

the jury's verdict, as all three defendants participated in the threats as aiders and abettors. Palmer encouraged Allen by "pumping him up" and displaying a gun. Childress facilitated the threats by driving the car and stopping alongside Love while his fellow gang members displayed their guns and threatened her. Both Allen and Childress offered encouragement or assistance by making a threat themselves. We conclude beyond a reasonable doubt that the omission of a unanimity instruction did not contribute to the verdict. (See *Chapman, supra*, 386 U.S. at p. 24.)

### D. *Attempted criminal threat*

Palmer and Allen contend that substantial evidence that Love did not experience sustained fear required the trial court to instruct, sua sponte regarding the elements of attempted criminal threat.

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.] A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, '"that is, evidence that a reasonable jury could find persuasive"' [citation], which, if accepted, '"would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser'* [citation]." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.) It does not mean "'*any* evidence, no matter how weak.'" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

As relevant here, a defendant is guilty of attempting to make a criminal threat when, "acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear . . . ." (*People v. Toledo* (2001) 26 Cal.4th 221, 231.) The trial court was thus required to instruct the jury regarding attempted criminal threat only if substantial evidence would support a finding that Love did not experience sustained fear.

Fear is "sustained" when it lasts "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

Allen points to Love's testimony that she was not initially afraid but became afraid when Allen pointed the gun at her and said, "Bitch, you can get smoked"; and her statement when identifying Allen, "Yeah, he had me out there for a long time in the sun. I was hungry." Allen concludes from these statements, when considered with Love's immediate notification to the police, her strange behavior, and lack of credibility, that substantial evidence supported a finding that she felt more inconvenienced than afraid, and that any fear was momentary. We agree with respondent that such evidence of Love's lack of fear was not substantial and did not require sua sponte instruction on attempted criminal threat.

We also agree that if substantial evidence had supported an instruction on attempted criminal threat, any error in omitting it would have been harmless. Error in failing to instruct on a lesser included offense is reviewed under the *Watson* test, which does not warrant reversal unless it appears reasonably probable after a review of the entire record, that defendants would have obtained a more favorable result had the asserted error not occurred. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 149, citing *Watson*, *supra*, 46 Cal.2d at p. 836; Cal. Const., art. VI, § 13.)

Fear is a state of mind that should be inferred from all the circumstances, even when the victim denies having been afraid. (See *People v. Renteria* (1964) 61 Cal.2d 497, 498-499.) A review of all the testimony reveals compelling evidence that Love was frightened by defendants' threats and that she experienced sustained fear. Although Love was not afraid at first because she thought defendants were flirting, she correctly concluded defendants were Blood gang members who were threatening her because of the color of her blue bandanna; and she soon became frightened when Palmer kept "pumping [Allen] up" while Allen pointed the gun at her and said, "Bitch, you can get smoked."

Love's impression that defendants held her for "a long time" was not simply a complaint about being in the sun as Allen argues. Love also testified, "He had the gun on me a very long time." Love's fear was sustained not only during the very long time that she was detained at gunpoint; her call to 911 indicated that she was still frightened at that

26

time.  (See *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538 [threat sufficiently frightening that victim called police].)

Finally, Love testified she was still in fear of defendants at the time of her testimony.  Although Love also claimed that defendants "intimidated" her rather than scared her, she agreed with the prosecutor that she was "afraid to be in court with some people."  Soon after she began her testimony, Love requested a break, and when she resumed, she complained that Childress kept staring at her, making her feel uncomfortable.  Given such testimony, it is not reasonably probable that defendants would have obtained a more favorable result had the instruction been given.  (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

### E.  CALJIC No. 2.92 / identification

The trial court read CALJIC No. 2.92 to the jury, listing a dozen factors to consider in determining the weight to be given eyewitness identification testimony. Palmer contends that the court should have modified the instruction to delete reference to the extent to which the witness is either certain or uncertain of the identification.  He argues that this factor was irrelevant, as no expert opinion was presented to support a positive correlation between witness confidence and accuracy of an identification. Palmer further argues that the certain/uncertain factor was erroneous, as demonstrated by Dr. Shomer's opinion and current scientific evidence showing no such positive correlation.

CALJIC No. 2.92 is a model instruction listing in a neutral manner, appropriate factors relevant to a jury's determination of the existence of reasonable doubt regarding identification.  (See *People v. Wright* (1988) 45 Cal.3d 1126, 1141-1142 (*Wright*).) "[A]n explanation of the *effects* of those factors is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate."  (*Id*. at p. 1143, fn. omitted.)

Palmer did not object to the instruction and does not claim to have suggested a modification.  The trial court had no sua sponte obligation to modify the instruction to delete the certain/uncertain language.  (*People v. Ward* (2005) 36 Cal.4th 186, 213

27

(*Ward*).) Moreover, a substantially identical argument was rejected by our Supreme Court in *People v. Johnson* (1992) 3 Cal.4th 1183, 1231 (*Johnson*); as well as by an appellate court in *People v. Sullivan* (2007) 151 Cal.App.4th 524, 561-562, and *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302-1303, disapproved on another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452. We are bound by the California Supreme Court decisions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Palmer nevertheless contends that we may reconsider those precedents. He claims that "the issue is not necessarily settled" because in *Ward*, the Supreme Court suggested that the wording of CALJIC No. 2.92 may be erroneous. We found only one statement in *Ward* regarding CALJIC No. 2.92 containing the word "erroneous." After finding no error in the trial court's failure to modify CALJIC No. 2.92 sua sponte, the court concluded: "And even assuming the wording of the standard instruction regarding an eyewitness's level of certainty was erroneous, the error was harmless." (*Ward*, *supra*, 36 Cal.4th at p. 214.) Such a rhetorical device hardly signals that the issue is not settled; indeed, *Ward*'s approval of the instruction indicates the contrary.

In an attempt to distinguish *Johnson*, Palmer points to the Supreme Court's rejection of the defendant's claim that the certain/uncertain language was improper because it contradicted her expert's otherwise uncontradicted testimony, "thereby implying the jury could not rely on her evidence." (*Johnson*, *supra*, 3 Cal.4th at p. 1231.) The court found no error in part because "the jury was instructed that it should consider '[t]estimony of any expert regarding acquisition, retention, or retrieval of information presented to the senses of an eyewitness,'" thus leaving the jury free to be persuaded by the expert's opinion. (*Id*. at p. 1232.) Palmer suggests that *Johnson* is not binding precedent here because there was no such instruction. We disagree. The *Johnson* court made clear that the trial court was not required to instruct the jury "to view the evidence through the lens of [the defendant's] theory." (*Ibid*.) Thus, although the jury was expressly directed to consider the expert's opinion in *Johnson*, we do not read the *Johnson* opinion as requiring such an instruction. Moreover, as given here, CALJIC No. 2.92 was sufficient to permit the jury to infer, if persuaded by the expert's testimony, that

28

a "positive identification was not necessarily an accurate one." (*Johnson*, *supra*, 3 Cal.4th at p. 1232.) The jury was instructed that the listed factors were not exclusive, that it should consider other factors; it was also instructed to consider whether the identification was, in fact, a product of the witness's own recollection, and "any other evidence relating to the witness'[s] ability to make an identification."

Palmer also suggests that *Johnson* is not applicable here because it has since been "firmly established, based upon numerous scientific studies, that there is no correlation between witness confidence and accuracy." Those studies are not part of the record on appeal, Palmer does not request judicial notice, and he cites no authority suggesting that we may disregard decisions of the California Supreme Court based upon such references to scientific studies. In fact, the principle of stare decisis is not a discretionary doctrine for courts of appeal to disregard in this manner. (*People v. Rippberger* (1991) 231 Cal.App.3d 1667, 1687-1688.)

In any event, had there been error, it would have been harmless. We apply the *Watson* test. (See *Wright*, *supra*, 45 Cal.3d at p. 1144.) First, as respondent points out, the instruction merely suggested to the jury that it could "consider" whether the witness was certain or uncertain. CALJIC No. 292 did not instruct the jury to give one factor more weight than the other or to give either factor any weight at all; thus it is unlikely that the instruction had any substantial effect on the jury.

Further, the identification evidence was overwhelming, as we discuss in the next section. We thus conclude that it was not reasonably probable that Palmer would have obtained a more favorable result had the disputed language been deleted. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

## III. *Aranda/Bruton/Crawford*

Palmer contends that Allen's redacted police interview was admitted into evidence in violation of his right to a fair trial and the confrontation clause of the Sixth Amendment of the United States Constitution, under the *Aranda-Bruton* or *Bruton* rule, which precludes the admission of a statement or confession of a nontestifying defendant if the statement incriminates a codefendant in a joint trial. (*Bruton*, *supra*, 391 U.S. 123;

*Aranda supra*, 63 Cal.2d 518.) Palmer also contends that his confrontation right was violated under the reasoning of *Crawford*, *supra*, 541 U.S. 36, in which the United States Supreme Court held that the Sixth Amendment bars the admission of testimonial statements of an unavailable declarant unless the defendant had a prior opportunity for cross-examination. (*Id*. at pp. 53-54, 68.)

Prior to trial Palmer brought a motion to be tried separately from his codefendants, in part based upon Allen's recorded interview with detectives. The prosecutor stated his intention to not introduce the statement unless Allen testified, and the trial court denied the motion. Some months later, just before jury selection, the prosecutor proposed to introduce a redacted transcript of the Allen interview. After the trial court ordered additional redactions, Palmer's counsel objected to the use of the pronoun "we" in the redacted statement. The court found that Allen's statements did not directly or indirectly implicate any codefendant, ordered the prosecutor to redact the tape accordingly, and overruled Palmer's objections.

The *Crawford* objection was renewed at trial during Detective Calicchia's testimony. Palmer's counsel interposed a continuing objection to statements Allen made to the detective. As grounds for the objection counsel stated: "Violates *Miranda*[10] and violates *Crawford*." We turn first to Palmer's contentions under the *Bruton* rule, as any statement admissible under that rule is also admissible under *Crawford*. (*People v. Stevens* (2007) 41 Cal.4th 182, 199.)

"Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant. This accords with the almost invariable assumption of the law that jurors follow their instructions [citation] . . . ." (*Richardson v. Marsh* (1987) 481 U.S. 200, 206-207 (*Richardson*).) "In *Bruton*, [the United States Supreme Court] recognized a narrow exception to this principle: [It] held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially

---

**10**     Counsel did not specify, but was apparently referring to *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445.

30

incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." (*Richardson*, at p. 207)  When the defendant is not named in the confession and it is not facially incriminating, "the calculus changes." (*Id*., at p. 211.)  Thus, "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Ibid*., fn. omitted.)

"Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration, . . . leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that . . . the law must require the same result." (*Gray v. Maryland* (1998) 523 U.S. 185, 192 (*Gray*); see also *People v. Lewis* (2008) 43 Cal.4th 415, 455.)  Similarly, merely substituting "pronouns or similar neutral terms for the defendant's name will not invariably be sufficient to avoid violation of the defendant's Sixth Amendment confrontation rights." (*People v. Fletcher* (1996) 13 Cal.4th 451, 468 (*Fletcher*).)  An "obvious deletion may well call the jurors' attention specially to the removed name.  By encouraging the jury to speculate about the reference, the redaction may overemphasize the importance of the confession's accusation -- once the jurors work out the reference. (*Gray*, *supra*, at p. 193.)  Thus, "considered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton's* unredacted confessions as to warrant the same legal results." (*Gray*, at p. 195.)

The redacted interview was played for the jury after the trial court admonished: "[T]he contents of this are admissible and I believe admitted against defendant Allen only and not to any other defendant."  The court also instructed the jury at the end of the trial not to consider the statement of any defendant against any codefendant.  Further, the prosecutor never mentioned the curfew issue, nor did he argue that Allen's statements incriminated Palmer.  In the interview, Allen never mentioned Palmer by name or nickname and did not give any description that might identify him.  The redacted

31

interview did not facially incriminate Palmer or obviously imply his guilt; we thus assume the jurors followed their instructions. (See *Richardson*, *supra*, 481 U.S. at pp. 206-209.)

Palmer contends that the redactions were inadequate because Allen referred to other perpetrators in the car. The detectives suggested that there were "three guys" in the car and Allen referred to "we," "they" and "them." In addition, Palmer points to Allen's admission that he had received a citation for a curfew violation sometime in the past. Palmer contends that this admission identified Palmer as one of the men in the car with him because Officer Vasquez had earlier testified that she stopped Allen and Palmer in August 2007 for a curfew violation.[11] Palmer argues that this testimony, coupled with Allen's admission "led to the obvious inference that Palmer was one of the other persons who were with Allen in the car at the time of the crimes."

In essence, Palmer contends that Allen's confession was so "powerfully incriminating" that the jurors could not be expected to follow the court's instruction to ignore it as to Palmer; and that the editing was insufficient because "reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession by symbol or neutral pronoun." (*Fletcher*, *supra*, 13 Cal.4th at pp. 455-456.) We disagree and find any such inference to be strained, or in respondent's words, defendant "attempts to stretch *Aranda/Bruton* too far."

The only inference that reasonable jurors could not avoid drawing from Officer Vasquez's testimony and the use of the pronouns "we" and "they" was that Allen and Palmer belonged to the same gang and were acquainted, as were many of the members of the P-Stones mentioned throughout the trial who committed crimes together. Many of

---

[11]    We note that it was Palmer's counsel who in cross-examination elicited Officer Vasquez's reason for stopping Allen and Palmer in August 2007. Her testimony came more than a week after counsel had been given the redacted transcript and the trial court had made additional redactions. We need not consider whether this was invited error, as we conclude there was no error and that Palmer suffered no prejudice from the admission and testimony regarding a curfew violation.

32

these gang members surely found themselves in the company of different fellow gang members at various times and sometimes with more than one or two other gang members. Palmer was in Allen's company in August 2007 due to a possible curfew violation by one of them; Allen admitted that at some unnamed time in the past he received a curfew citation; there was no evidence to suggest that these two occasions were the same or that Allen received his citation in August 2007. We cannot conclude that "reasonable jurors could not avoid drawing the inference" from such evidence that Allen and Palmer were together on May 8, 2008. (*Fletcher*, *supra*, 13 Cal.4th at p. 456.)

We conclude that the interview was sufficiently edited to avoid incriminating Palmer, and thus the jury followed the trial court's instructions not to consider it against Palmer. As a result there was no *Crawford* error. (See *People v. Stevens*, *supra*, 41 Cal.4th at p. 199.)

Nevertheless, any error would be harmless beyond a reasonable doubt under the standard of *Chapman*. *Aranda*/*Bruton* error is deemed harmless if "'the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence . . . .' [Citation.]" (*People v. Burney* (2009) 47 Cal.4th 203, 232.) Such is the case here. Childress, Allen and Palmer were members of the same criminal street gang whose primary activities included murder and attempted murder. Both Miralda and Love identified Palmer at trial and earlier at the preliminary hearing as the front passenger in Childress's car. Four days after the shooting, Miralda identified Palmer in a photographic lineup as the front seat passenger who wore a gray sweater with a red design. When Love was shown a photographic lineup on the same day, she thought that Palmer resembled the front seat passenger, and at a live lineup three days later, Love positively identified Palmer as the front seat passenger. Although Love initially thought that Palmer's shirt had buttons, she and Miralda identified the red and gray sweatshirt found in Palmer's home as the one he was wearing when they saw him. Palmer's cell phone records showed that he received a call through a cell tower within 3/10 mile of the scene of the Gallegos murder at approximately 10:25 a.m. on that day.

Palmer contends that the weaknesses in the prosecution's case are demonstrated by the absence of physical evidence such as his fingerprints in the vehicle and guns or bullets on his person; the jury's request for a readback of Miralda's testimony identifying Childress as the driver and describing the shooter and the passenger; the "lengthy" deliberations of about six hours; that Love initially thought Palmer had worn a red and gray shirt with a collar and buttons; that Love was unsure of her selection of Palmer's photograph; that Miralda was unsure of his identification of Palmer at the live lineup; and the custodian of Palmer's cell phone records testified that a cell phone was normally within one to one and a half miles of a cell tower, but he had heard of cell towers with a range of up to six miles.

Such evidence did not create any substantial conflict. Because there was no evidence contradicting Miralda's identification or the location of the cell tower through which a call to Palmer came at 10:25 a.m., no substantial dispute was created. The deliberations were not lengthy considering that the trial had lasted five days and involved three defendants, five counts, and numerous special allegations. (Cf. *People v. Houston* (2009) 130 Cal.App.4th 279, 301.) The readback request was for testimony relating to the identification of all three defendants and did not, without more, suggest that the jury was troubled by the issue of Palmer's identification. We conclude beyond a reasonable doubt that Allen's confession "did not contribute to the verdict obtained" against Palmer and thus any error in admitting it was harmless. (*Chapman*, *supra*, 386 U.S. at p. 24.)

## IV. Discretionary severance

Allen and Palmer contend the trial court abused its discretion in denying their motions to conduct a separate trial as to count 1, charging Childress with the murder of Martinez. They argue that severance was warranted because the evidence was inflammatory and unjustifiably corroborated the case against them.

Under section 954, "[t]wo or more offenses 'of the same class,' or 'connected in their commission,' may be charged and tried together, but the trial court may sever counts in the interest of justice. [Citation.] When exercising its discretion, the court must balance the potential prejudice of joinder against the state's strong interest in the

34

efficiency of a joint trial. [Citation.] [¶] Joinder is generally proper when the offenses would be cross-admissible in separate trials, since an inference of prejudice is thus dispelled. [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 126.) Because the joined offenses involved murder, they were the same class of crimes, satisfying the statutory requirements for joinder, and placing the burden on Palmer and Allen to make a clear showing of a substantial danger of prejudice if the crimes were tried together. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

"We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion. [Citation.] If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder '"resulted in 'gross unfairness' amounting to a denial of due process."' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 575 (*Avila*).) Palmer and Allen bear the burden to make a "'*clear showing of prejudice* to establish that the trial court *abused its discretion* . . . .' [Citations.]" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).) "Even if the court abused its discretion in refusing to sever, reversal is unwarranted unless, to a reasonable probability, defendant would have received a more favorable result in a separate trial. [Citation.]" (*Avila*, *supra*, at p. 575.)

"Whether a trial court abused its discretion in denying a motion to sever necessarily depends upon the particular circumstances of each case. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 27.) "Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.

[Citations.]" (*People v. Sandoval* (1992) 4 Cal.4th 155, 172-173 (*Sandoval*); see also *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 938-939 (*Calderon*).)[12]

The first *Sandoval* factor is satisfied, as Palmer agreed in his motion and Allen agreed at the hearing on his motion that there would be cross-admissibility of gang membership and motive. The lengthy testimony of the gang expert regarding the culture of the P-Stone gang, Childress's membership in the gang, the gang's hatred for the 18th Street gang, and the likelihood that the Gallegos shooting was motivated by that hatred would have been admissible in both cases, as both murders were alleged to have been committed for the benefit of or in association with a gang with the intent to promote, further, or assist in criminal conduct by gang members. (See § 186.22, subd. (b).) This evidence alone justified the trial court in denying the motion. (See *People v. Davis* (1995) 10 Cal.4th 463, 508.)

Both Palmer and Allen argue that *only* the gang evidence was cross-admissible, suggesting that the *quantum* of cross-admissibility of evidence was insufficient. If so, there is no minimum cross-admissibility requirement, as they suggest; indeed, there need be no cross-admissible evidence at all to justify a joint trial of the same class of crime. (*Alcala*, *supra*, 43 Cal.4th at pp. 1221-1222; § 954.1.)

Next, Allen and Palmer contend that the second *Sandoval* factor militated in favor of severance, arguing the fact that both crimes were gang related was inflammatory, and that the Martinez shooting was particularly inflammatory because the incident was videotaped and Martinez was shot twice in the head while panhandling.[13] We disagree,

---

[12] For convenience we refer to the factors as the *Sandoval* factors. The fourth factor is inapplicable as the prosecution did not seek the death penalty against Childress or Palmer, and Allen was a minor when the crimes were committed and thus ineligible for the death penalty. (See § 190.5, subd. (a).)

[13] To the extent Palmer or Allen means to suggest that because one of the bullets entered the back of Martinez's head, the murder was an "execution-style" shooting, which was a significant fact in *Calderon*, we reject the suggestion. There was no evidence here that the bullet to the back of the head was fired at close range or that Martinez had been restrained or incapacitated.

as both murders were equally inflammatory. The Gallegos murder was no less heinous than the Martinez murder in that 19-year-old Gallegos was shot four times by gang members while she was sitting in her car chatting with her boyfriend. The fatal bullets tore through her stomach, heart, lung, kidney, and liver. The Martinez murder was not "*unusually* likely to inflame the jury against" Palmer or Allen. (*Sandoval*, *supra*, 4 Cal.4th at p. 172, italics added.)

Finally, both Palmer and Allen contend that the evidence in the Martinez murder was strong compared to that in the Gallegos murder and thus served to bolster a weak case against them. We have already rejected Palmer's contention that the identity evidence against him was weak as well as Allen's contention that the case against him was weak, given his admission of involvement in both incidents on May 8, 2009. Allen told detectives he was a passenger in a car when they saw the woman in the blue bandanna and "talk[ed] shit" to her. He admitted he was present at the Gallegos shooting and that there was a gun in the car. Miralda identified the shooter as Allen, and Allen's fingerprints were found in Childress's car.

Such evidence against Palmer and Allen was sufficient to support the judgments without the Martinez evidence. "[A]s between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges. [Citation.]" (*People v. Soper* (2009) 45 Cal.4th 759, 781.) "'[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.'" (*Ibid*., quoting *Zafiro v. United States* (1993) 506 U.S. 534, 540.)

In sum, Allen and Palmer have not shown that the evidence at trial would not be cross-admissible in separate trials, that the Martinez charge was unusually inflammatory, or that their case was so weak when compared to the Martinez case to risk a spillover effect; thus they have not established an abuse of discretion. (See *Sandoval*, *supra*, 4 Cal.4th at pp. 172-173.) Nor have Palmer or Allen shown a probability that there was a

spillover effect on them from the Martinez charge and thus they have not shown gross unfairness or even a reasonable probability of a more favorable result in a separate trial. (*Avila*, *supra*, 38 Cal.4th at p. 575.)

## V. Allen:  cruel and unusual punishment

Allen contends that because he was a juvenile at the time he committed his crimes, his aggregate sentence of 107 years to life is cruel and unusual in violation of the Eighth Amendment to the United States Constitution.[14]

Generally a sentence does not violate the Eighth Amendment so long as the ultimate punishment is not grossly disproportionate to the crime; and no individualized proportionality review for a sentence less than death is required unless the punishment gives rise to an inference that it was grossly disproportionate to the crime.  (*Harmelin v. Michigan* (1991) 501 U.S. 957, 995-996; *Solem v. Helm* (1983) 463 U.S. 277, 288-289.)

In 2005, the United States Supreme Court determined that capital punishment was a per se grossly disproportionate sentence for defendants who were juveniles at the time they committed the crime for which they were sentenced, even when the crime was murder.  (*Roper v. Simmons* (2005) 543 U.S. 551, 578-579 (*Roper*).)  A few years later, the court held that the Eighth Amendment categorically barred LWOP for minors who committed nonhomicide offenses.  (*Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011] (*Graham*).)  More recently, the United States Supreme Court has held that a sentencing scheme that mandates LWOP sentences for minors, even those who commit murder, is barred by the Eighth Amendment.  (*Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455, 2469] (*Miller*).[15]  The *Miller* holding was limited:  "'A State is not required

---

**14**      Allen also contends that his sentence was cruel or unusual in violation of the California Constitution but does not set forth a separate argument under the California Constitution.

**15**      Following its reasoning in *Graham* and *Roper*, the Supreme Court explained that immaturity and an underdeveloped sense of responsibility gave children a tendency toward "recklessness, impulsivity, and heedless risk-taking"; they are "'more vulnerable . . . to negative influences and outside pressures'"; "have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing

to guarantee eventual freedom,' but must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*Id.* at p. 2469.)

Following the reasoning of *Miller*, the California Supreme Court held that a cumulative sentence of 110 years to life for attempted murder committed by a juvenile was the "functional equivalent of a life without parole sentence" and thus categorically barred under *Graham*. (*People v. Caballero* (2012) 55 Cal.4th 262, 267-269 (*Caballero*).)  However, the court expressly left "*Miller*'s application in the homicide context to a case that poses the issue." (*Caballero*, at p. 268, fn. 4.)[16]

Relying on *People v. Thomas* (2012) 211 Cal.App.4th 987 (*Thomas*), and *People v. Argeta* (2012) 210 Cal.App.4th 1478 (*Argeta*), Allen suggests that resentencing is required in all pre-*Miller* juvenile cases of LWOP or the functional equivalent in which the sentencing court did not have the benefit of *Miller's* definition of the appropriate and lawful scope of its discretion and thus did not conduct an individualized analysis of the suggested factors.  We need not rely on *Miller* however, to find Allen's sentence unauthorized, as the California statute does not permit LWOP sentences for defendants who were 14 or 15 years old at the time they committed murder.  (§ 190.5; *People v. Demirdjian* (2006) 144 Cal.App.4th 10, 17 (*Demirdjian*).)

Although the California Supreme Court has not reached the issue of *Miller*'s applicability to murder, the court did make clear that a life sentence with a parole

_____

settings.  [Citation.]  And . . . a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'  [Citation.]" (*Miller*, *supra*, 132 S.Ct. at p. 2464.)  The court concluded that "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children"; and sentencing courts must "have the ability to consider the 'mitigating qualities of youth.'  [Citation.]" (*Id.* at pp. 2466-2467.)

[16]    The application of *Miller* to an LWOP sentence for a first degree special circumstance murder personally committed by the defendant is currently a question before the California Supreme Court.  (See, e.g., *People v. Siackasorn* (2012) 211 Cal.App.4th 909, review granted Mar. 20, 2013, S207973; *People v. Moffett* (2012) 209 Cal.App.4th 1465, review granted Jan. 03, 2013, S206771; *People v. Gutierrez* (2012) 209 Cal.App.4th 646, review granted Jan. 03, 2013, S206365.)

eligibility date that falls outside the juvenile offender's natural life expectancy is the functional equivalent of LWOP. (*Caballero*, *supra*, 55 Cal.4th at pp. 267-268.) Indeed, the court relied in part on our pre-*Miller* opinion to that effect. (See *People v. Mendez* (2010) 188 Cal.App.4th 47, 50-51 (*Mendez*).) In *Mendez*, we determined that 84 years to life amounted to a de facto LWOP sentence, as the minimum parole date exceeded the 76-year life expectancy of an 18-year-old American male. (*Mendez*, *supra*, 188 Cal.App.4th at pp. 62-63.) The minimum parole period of 107 years imposed on Allen clearly exceeds that. Thus, before reaching any constitutional issue, we observe that Allen's sentence is unauthorized.

Nevertheless, Allen's sentence for first degree murder of 25 years to life in prison was mandated by statute. (§ 190, subd. (a).) The court was also required to impose the 25-year-to-life enhancement under section 12022.53. Thus the trial court had the authority to impose a sentence of 50 years to life plus life, but no less.

Allen contends that even a sentence of 50 years to life would exceed his expected life span and would be cruel and unusual under the principles enunciated in *Graham*, *Miller*, and *Caballero*. We disagree. A 50-year minimum parole period for a 15-year-old offender provides reasonable opportunity for parole before his life is expected to end. (See *Mendez*, *supra*, 188 Cal.App.4th at pp. 62-63; *Demirdjian*, *supra*, 144 Cal.App.4th at p. 17.)

Allen contends that *Demirdjian* and other cases are outdated as they were decided prior to the publication of *Miller* and *Caballero*; he concludes that his sentence should be vacated because there is no indication in the record that the trial court considered such factors suggested by the Supreme Court as the offender's immaturity, his upbringing, mental and emotional development, impetuosity, ability to appreciate risks and consequences, and his potential for rehabilitation. (*Miller, supra*, 132 S.Ct. at pp. 2464-2465, 2468-2469.) Pointing out the more recent cases of *Thomas* and *Argeta*, in which appellate courts order resentencing in light of *Miller*, Allen suggests that resentencing is required in all pre-*Miller* juvenile LWOP cases. As we have determined that as modified

40

here, the sentence will no longer be a functional LWOP sentence, the remedy used in such cases is unnecessary.[17]

Allen provides website links to the United States Census Bureau, the Center for Disease Control, and other sites setting forth the average life expectancy for a male African-American born between 1990 and 1995.  As Allen does not request judicial notice of the materials nor provide copies, we decline to conduct our own Internet research or create a new, fluid life expectancy rule.

Moreover, such a rule would prove unworkable.  This is illustrated by the reasoning in *Argeta*, in which defendant contended his functional equivalent LWOP sentence should have been categorically barred under *Graham*, *Miller*, and *Caballero* because he was just a few months past his 18th birthday when he committed his crimes. (*Argeta*, *supra*, 210 Cal.App.4th at p. 1482.)  There, the appellate court noted that such arguments had "been made in the past, and 'while drawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules . . . [, it] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.]" (*Ibid*., quoting *Roper*, *supra*, 543 U.S. at p. 574, and citing *Graham*, *supra*, 130 S.Ct. at p. 2016.)  Similarly, the line for life expectancy must be drawn at an average of *all* American men.  Otherwise the uncertainty and equities that would result from imposing all the variables of race, culture, region, family history, ad infinitum, would

---

[17]    Further, Allen could have sought an individualized proportionality review in the trial court under the California Constitution, which has long called for a consideration of relevant factors relating to youth.  (See *People v. Dillon* (1983) 34 Cal.3d 441, 479 (*Dillon*); *In re Lynch* (1972) 8 Cal.3d 410, 424; Cal. Const., art. 1, § 17.)  Relevant factors for youthful offenders include, like the *Graham/Miller* factors, age, prior criminality, personal characteristics, individual potential, and state of mind.  (See *Dillon*, *supra*, at pp. 479-480, 482 [17-year-old offender].)  Defense counsel did not produce evidence of any mitigating factor other than Allen's age.  Further, Allen does not contend here that the minimum terms mandated by sections 190, subdivision (a), and 12022.53 are unconstitutional as applied to him, nor did he make that contention below; rather he claimed that a term of *more* than 50 years to life was cruel or unusual under the California Constitution.

effectively eviscerate our mandatory sentencing laws. As there is no prohibition against mandatory sentences of less than LWOP for offenders who committed murder under the age of 16, there is no need to create the categorical bar advocated by Allen or the many other categorical bars that would spring from it.

## DISPOSITION

The judgments against Childress and Palmer are affirmed. Allen's sentence is modified as follows: as to count 2, the term of 25 years to life, plus a consecutive a firearm enhancement of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e) remains unchanged, and all other terms and enhancements remain imposed but are stayed, for a total unstayed term of 50 years to life plus life in prison. In all other respects, the judgment against Allen is affirmed. The trial court is directed to prepare an amended abstract of judgment for Allen and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

42